UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TYLER M. ROCKWELL,

                Plaintiff,

      v.                                        Case No. 17-C-373

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

## DECISION AND ORDER

This is an action for judicial review of a decision by the Commissioner of Social Security denying the application of Plaintiff Tyler Rockwell for supplemental security income (SSI) under Title XVI of the Social Security Act. The case is a troubling one. Plaintiff, currently 27 years old, was only 22 years old at the time he filed his application claiming disability due to seizures, associated memory loss, and depression. Plaintiff has never held a job. He lives with his mother, and by both of their accounts, he never leaves home unaccompanied and spends the bulk of his day lying in bed, taking his medication, and eating. Despite these extreme limitations in his daily activities, the Administrative Law Judge (ALJ) concluded that he was not disabled. In other words, the ALJ concluded that Plaintiff was unreasonably limiting himself to the activities of one in need of a skilled nursing facility. R. 20. Plaintiff claims that the ALJ erred in reaching this conclusion. He contends that the ALJ failed to properly weigh the medical source opinions contained in the record, failed to make adequate findings to support the Residual Functional Capacity (RFC) determination, and failed to appropriately assess Plaintiff's subjective complaints of disabling symptoms.

The ALJ did not lightly reach this conclusion, however. In addition to the treatment records and reports of Plaintiff's own doctors, he carefully considered the reports of two consultative examiners, the state agency consultants who reviewed the file, and the testimony of three different medical experts who testified at two separate hearings he held in the matter before issuing his nineteen-page decision explaining his route to this conclusion. For the reasons set forth below, the decision of the Commissioner will be affirmed.

## BACKGROUND

Plaintiff filed his application for SSI on July 22, 2013, alleging that he has been disabled since March 1, 2011, as a result of epileptic seizures, depression, daytime episodes of convulsive epilepsy, and memory loss associated with on-going epileptic seizures. R. 87. His application was denied both initially in October 2013 and on reconsideration in February 2014. R. 99, 115. Plaintiff requested a hearing before an ALJ, and a hearing was scheduled for January 2016. R. 42, 132.

On the day scheduled for the hearing, ALJ Steven H. Templin heard testimony from Dr. Sheldon J. Slodki and Dr. Terry H. Shapiro but otherwise granted a continuance to allow Plaintiff time to obtain representation. R. 12, 43, 45–46. The hearing was then continued on April 15, 2016, and Plaintiff appeared again on that date represented by counsel. R. 59. Plaintiff, his mother, a vocational expert (VE), and Dr. Michael Cremerius all testified at the rescheduled hearing. R. 58.

Plaintiff testified that he has never held or applied for any kind of job, and all of his support comes from his mother. R. 69–70. On a typical day, he gets up around 11:30 a.m., cleans himself up before taking his medication at 12:30 p.m., lies in bed and rests until he eats at 3:30 p.m., eats again at 8:30 p.m. and 12:30 a.m., takes more medication, and goes to bed. R. 68. Throughout the day, he avoids activities like reading, doing crossword puzzles, or watching videos because those

things make him dizzy and tired. R. 68–69. However, he admitted that when he watched videos or reviewed reading materials as part of medical testing, he was able to remember what they said and recite them back in chronological order. R. 69. During the day he does not participate in any volunteer groups, social clubs, or other activities outside of the home, and even when his mother asks him to perform tasks around the house during the day, he often forgets or otherwise fails to do them. R. 69–70. At most, he finishes one or two tasks that his mother asks him to complete. R. 70. He has few friends, and he rarely goes out of the house to see them. *Id.* Finally, when asked how well his medications control his seizures, he testified that "it's been pretty good," but he still frequently gets dizzy and tired, adding "I can feel it at times, coming on, so it's still with me, definitely." R. 70–71.

After Plaintiff's testimony, the ALJ also heard testimony from Plaintiff's mother. R. 71. She acknowledged that she encouraged Plaintiff to apply for SSI and assisted him throughout the application process, and she testified to her belief that Plaintiff experiences attention deficit hyperactivity disorder (ADHD) and obsessive compulsive disorder (OCD). R. 71–72. Regarding her belief that Plaintiff experiences ADHD and OCD, she explained that he sticks to a specific routine, takes his pills and eats food at precise times throughout the day, eats the same foods repeatedly, and organizes his room in a particular, consistent manner. R. 72. She added that he becomes frustrated when he deviates from that routine and, in particular, becomes "loopy" and dizzy if he does not eat when he takes his medication. *Id.* Although she works outside the home between 6:30 a.m. and 3:30 p.m., she is very concerned about Plaintiff while he is home alone, and she testified that they stay in contact by phone throughout her workday. R. 73–74.

3

Plaintiff's mother further testified regarding his social life and other activities around the house. Noting that Plaintiff does not drive, she testified that he sometimes spends time with friends who are willing to pick him up at the house, and those friends know what signs to watch for regarding seizures. R. 74. However, she explained that Plaintiff has not seen one friend since he collapsed from a seizure and lost his two front teeth while they were together. R. 74–75. When Plaintiff is home alone, she testified, there is nobody in the neighborhood who is nearby and in a position to help easily. R. 76. Noting that Plaintiff usually just prepares milk and cereal for himself when he is home alone, she testified that, although he can use a microwave and she does not limit the food that Plaintiff may prepare for himself, she would not want him using the oven alone. R. 76–77. She did not think that Plaintiff would be capable of leaving the house every day and training for an assembly job, observing that Plaintiff does not finish the tasks she assigns him. R. 78.

The record reflects that Plaintiff graduated from high school after two years of home schooling with grades of B/Cs and sometimes lower, ending with a 1.7 GPA. He reported no special education and never repeated a grade. He had some friends but was not active in extracurricular activities. According to a January 2016 report, he watches television, plays video games, and eats during the day. His most recent seizure at that time was 1½ years ago. He had undergone an evaluation at the Mayo Clinic in November 2013 and had responded well to a medication adjustment. R. 644.

Plaintiff's first seizure as an adult occurred on January 4, 2011, when he was age 19. Dr. James Napier saw Plaintiff with his mother on that date after Plaintiff had experienced a convulsive seizure at home while yelling and screaming at a wrestling match he was watching on the computer. His mother described Plaintiff as foaming at the mouth and shaking for three to four minutes. She

4

reported he had a seizure at age six that was thought to be febrile, but none since. An EEG showed "slight abnormality in the left hemisphere." Plaintiff was started on Lamictal, an anticonvulsant. R. 356–57.

Plaintiff remained seizure free thereafter until on August 16, 2012, he reported a seizure that occurred 10 days earlier and experienced a generalized convulsion at the neurologist's office. Dr. Napier increased his Lamictal to 300 mg, twice daily. No further seizures were reported until he reported experiencing three seizures on February 7, 2013: at a workout facility, at a desk outside his home, and while playing basketball. R. 20, 22. His medication was increased at that time to 400 mg, twice daily. He presented to the emergency room at Aurora Medical Center after experiencing another seizure on February 23, 2013. He was then referred to a second neurologist.

Dr. George Morris had Plaintiff admitted to St. Luke's Center in Milwaukee for a week from March 7 to 14, 2013, for a prolonged video EEG and monitoring. In an apparent effort to induce a seizure, Plaintiff's medication was withdrawn, and he was hyperventilated, photic stimulated, and sleep deprived. He experienced no seizures over the week, and clinical findings on discharge were normal. His medication was resumed, and Plaintiff was told to return to either the specialist or the hospital if his seizures recurred. R. 22–23.

On June 13, 2013, Plaintiff presented to the hospital ER and reported having experienced a seizure while playing basketball. He reported he had fallen on his face and knocked out his two front teeth. Findings on clinical examination were within normal limits, and Plaintiff denied either memory loss or altered mental status. R. 23. Plaintiff reported ongoing seizures at a routine physical examination in October 2013, but there is no further evidence of convulsive seizures resulting in hospitalization after June 2013. Plaintiff was evaluated at the Mayo Clinic in November 2013, at

5

which time his medication was again adjusted.  R. 17, 23.  Dr. J.W. Britton, the Mayo specialist who evaluated Plaintiff, characterized his seizures as uncontrolled based on the history provided by Plaintiff or his mother which included a frequency estimate of one to two per month.  R. 23 (citing R. 521–22).

In a nineteen-page decision dated July 7, 2016, the ALJ determined that Plaintiff is not disabled.  R. 11–29.  The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA).  R. 13.  At step one, the ALJ concluded that Plaintiff has never engaged in substantial gainful activity.  *Id.*  At step two, the ALJ concluded that Plaintiff has three severe impairments: complex partial seizures, cognitive disorder, and depressive disorder.  *Id.*  At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 17.  With regard to Plaintiff's physical impairments, the ALJ considered listings 11.02 (convulsive epilepsy) and 11.03 (nonconvulsive epilepsy).  R. 17.  With regard to his mental impairments, the ALJ considered listings 12.02 (organic mental disorders) and 12.04 (affective disorders) and determined that Plaintiff did not have a sufficient combination of marked impairments and repeated episodes of decompensation to satisfy the "paragraph B" criteria for either listing.  R. 18.  Nor did the evidence support the existence of either listing's "paragraph C" criteria.  *Id.*

The ALJ next concluded that Plaintiff had the following RFC:

The claimant has the capacity to perform the exertional and nonexertional requirements of work except for climbing ropes, ladders, or scaffolds; working at or around hazards; operating a motorized vehicle; understanding and remembering other than simple instructions; carrying out other than simple, routine tasks; performing

tasks requiring other than incidental public contact; performing tasks requiring other than occasional contact with coworkers; or performing fast paced tasks.

R. 28 (italics omitted). That finding followed an eight-page discussion of Plaintiff's medical records, as well as a one-page discussion of the weight the ALJ assigned to the various medical source opinions in the record. R. 18–27. At step four, the ALJ once again noted Plaintiff's lack of any work history. At step five, the ALJ then relied on the VE's testimony that a person with Plaintiff's age, educational background, work experience, and RFC would be able to perform work at the unskilled level that is available in significant numbers in the national economy. R. 29. Specifically, the VE testified that Plaintiff would be capable of performing work as a laundry laborer at the medium exertional level, as a cleaner or housekeeper at the light exertional level, and as a final assembler at the sedentary exertional level. *Id.* Accordingly, the ALJ found that Plaintiff is not disabled. *Id.* The Appeals Council denied Plaintiff's request for review of that decision. R. 1. Plaintiff thereafter filed for review in this court.

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 404 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the

conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Plaintiff contends that this court should reverse the Commissioner's decision for three reasons. First, he argues that the ALJ improperly weighed various physician opinions contained in the record. Second, he argues that the ALJ improperly formulated his RFC, which he contends did not adequately account for limitations arising from his physical and mental impairments. In particular, he asserts that the ALJ erred by failing to make a specific finding regarding the frequency of each type of seizure he experiences. Finally, he argues that the ALJ improperly discounted his subjective complaints of disabling symptoms and failed to provide a clear, logical explanation of his reasons for doing so. None of these arguments require reversal of the Commissioner's decision.

### A. Assignment of Weight to Medical Source Opinions

Plaintiff first takes issue with the weight, or the lack thereof, that the ALJ assigned to the opinions of seven different medical sources in the record. Under the regulations in force at the time

Plaintiff filed his claim, "medical opinions" consisted of "statements from physicians or psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §416.927(a)(2). An ALJ determining the appropriate weight to assign to a particular medical opinion considers factors including whether the medical source examined the claimant; the extent of any treatment relationship between the source and the claimant; the extent to which the source presents relevant evidence to support the opinion; the opinion's consistency with the record as a whole; and whether the source's opinion relates to a subject in which the source specializes. *Id.* § 416.927(c).

"An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence.'" *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (per curiam) (quoting *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000)). Furthermore, "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (per curiam). A court reviewing an ALJ's assignment of weight to various medical sources "cannot substitute [its] own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled," but must instead determine "whether the ALJ's findings were supported by substantial evidence." *Diaz v. Chater*, 55 F.3d 300, 305–06 (7th Cir. 1995).

Of the seven medical source opinions that Plaintiff identifies in this section of his argument, he devotes the largest portion of his brief to that of Dr. Julie Bobholz, who conducted a neuropsychological evaluation of Plaintiff in January 2016. R. 619. The ALJ assigned "significant weight" to Dr. Bobholz's opinion, which the ALJ determined supported a finding that Plaintiff "has

significant impairments due to [the] combined effects of his physical, cognitive, and emotional disorders" and also called into question whether Plaintiff "could maintain attention throughout an 8 hour workday." R. 27. For the January 2016 evaluation, Dr. Bobholz interviewed Plaintiff and his mother, reviewed Plaintiff's medical records, and administered a battery of neurospsychological measures to him. R. 619. Observing that Plaintiff "would struggle in most work situations," Dr. Bobholz opined that he would have problems with organization and processing spatial information "and would also likely struggle with handling novel situations given his executive dysfunction." R. 621. Accordingly, Dr. Bobholz concluded, "his deficits would make it very difficult for him to succeed in most work situations." *Id.*

The ALJ acknowledged these comments by Dr. Bobholz, and explained why he discounted them. He noted that Dr. Bobholz's evaluation, which appeared to have been done in a forensic context, i.e., for purposes of litigation, resulted in some findings that the ALJ characterized as "effort dependent." In the view of the ALJ, "[g]iven those effort dependent 'findings' in the context of the requested evaluation at which both the claimant and his mother provided descriptions of his daily activities . . . , the examiner—understandably—thought that the claimant would struggle and would find it difficult to succeed in most work situations, and that employers must consider the claimant's cognitive 'issues.'" R. 21. The ALJ concluded that Dr. Bobholz's "*vocational analysis* lacks the degree of specificity—through the identification of specific, vocationally expressed limitations[—]to permit the use of this report for, e.g., vocational placement of the claimant." *Id.*

The ALJ also noted that Dr. Bobholz completed a worksheet that called for her to indicate her opinion as to various limitations on Plaintiff's ability to perform work. R. 636–41. For example, she checked boxes indicating that Plaintiff would be limited to seriously limited in (but not entirely

precluded from) retaining procedures, maintaining regular attendance, and being punctual within typical expectations, among several other subcategories. R. 638. The ALJ found these limitations "generally consistent" with those described by Dr. Larry Kravitz, in his February 19, 2014 mental RFC report. R. 27 (citing R. 113). Based upon his review of the record, Dr. Kravitz concluded that Plaintiff would be able to understand and remember clear, concise, and systematic instructions, and able to carry out simple, repetitive tasks that were not fast-paced and did not require other than routine workplace changes. R. 113. The ALJ noted that "medical consultants to the Administration—as opposed to other non-examining or non-treating medical consultants who may review and comment upon medical evidence—are recognized to have specialized knowledge concerning the disability program and its evidentiary requirements." R. 27 (citing 20 C.F.R. § 416.927(c)(6)).

To this extent, the ALJ gave some weight to Dr. Bobholz' opinions on the worksheet. R. 25. He specifically gave "no weight," however, to a checkbox expressing her opinion that Plaintiff's impairments or treatment would cause him to be absent from work, on average, more than five days per month. R. 25, 640. The ALJ explained that he singled out this opinion because Dr. Bobholz "provided absolutely no explanation, nor citation to any clinical or laboratory finding" for it. R. 25. Plaintiff suggests that the ALJ "should have recontacted [Dr. Bobholz] for clarification" of the basis for her absences opinion, rather than reject it. But Dr. Bobholz was not a treating physician or psychologist, and in fact, Plaintiff had never sought treatment for mental health issues. R. 25. Under these circumstances, it was not incumbent upon the ALJ to ask for further clarification. The court will not remand a case to have the ALJ reweigh an opinion that was properly disregarded for lack

of support in the record, particularly where it was Plaintiff's obligation to present evidence in support of his alleged impairments and he was represented by counsel at his second hearing.

Plaintiff next argues that the ALJ failed to adopt limitations identified by Dr. Stacey Soeldner in an October 2012 psychological report produced as part of a consultative examination. R. 514–19. Plaintiff points to Dr. Soeldner's opinion that he experiences marked limitations on his ability to understand, remember, and carry out simple instructions; marked limitations on his ability to maintain concentration, attention, and work pace; moderate limitations on his ability to withstand routine work stress; and mild limitations on his ability to adapt to change. R. 517. Plaintiff contends that the ALJ's RFC determination does not adequately account for the significant weight afforded to Dr. Soeldner's opinion by finding that Plaintiff is capable of performing unskilled work "except for . . . understanding and remembering other than simple instructions; carrying out other than simple, routine tasks; . . . or performing fast paced work." R. 28.

The ALJ provided a reasoned explanation for not adopting Dr. Soeldner's opinion uncritically, noting that "no treating or reviewing medical source, or even another examiner who conducted a more thorough evaluation . . . (Dr. Bobholz) thought that the claimant was" as impaired as Dr. Soeldner opined. R. 14. The ALJ also discussed Dr. Soeldner's evaluation in the context of his discussion of the allegation that Plaintiff's seizure disorder had resulted in cognitive deficits. The ALJ observed that Plaintiff's mother was a significant participant in the evaluation, telling the examiner, for example, that after experiencing a seizure, Plaintiff needed to sleep for a full week. Not having the opportunity to review the medical evidence of his actual post-seizure functioning, the ALJ noted that the examiner "could do nothing but accept such statements as valid." R. 23. Plaintiff's mother also reported that Plaintiff was depressed, even though when he was interviewed

he reported that "on a typical day, he was in a good mood." *Id.* For this reason as well, the ALJ apparently felt that Plaintiff's mother may have influenced Dr. Soeldner's evaluation of Plaintiff's functional ability. As a result, the ALJ's RFC formulation reflects the significant weight assigned to Dr. Soeldner's opinion by assessing limitations in each of the identified categories, but at the same time, it reasonably acknowledges the ways in which Dr. Soeldner's opinion is an outlier as compared to the rest of the record by declining to incorporate the marked limitations.

Plaintiff further objects to the ALJ's decision to "adopt" the opinions offered by Dr. Sheldon Slodki and Dr. Michael Cremerius at the first and second hearings, respectively. R. 27. Arguing that the ALJ improperly favored the opinions of Drs. Slodki and Cremerius over the opinions of Drs. Bobholz and Soeldner, Plaintiff notes the Seventh Circuit's admonition that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470 (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). Yet the discussion above shows that the ALJ's RFC formulation was largely consistent with the opinions of Drs. Bobholz and Soeldner. To the minimal extent the ALJ deviated from their opinions, he provided an explanation for doing so supported by substantial evidence.

Once it becomes clear that the ALJ's RFC formulation did not reflect a wholesale rejection of the opinions of Drs. Bobholz and Soeldner, as Plaintiff argues, then the true nature of the ALJ's treatment of Drs. Slodki and Cremerius comes into focus: their opinions provide substantial evidence to support the inclusion of *additional* limitations on Plaintiff's RFC beyond those supported by the opinions of Drs. Bobholz and Soeldner. As prophylactic restrictions in light of Plaintiff's history of seizures, Dr. Slodki opined that Plaintiff should never climb ropes, ladders, or scaffolds; should not

be exposed to machinery or other dangerous industrial situations; and should not drive unless cleared by the state licensing agency. R. 51. Accordingly, the ALJ determined that Plaintiff is capable of performing work "except for climbing ropes, ladders, or scaffolds; working at or around hazards; [and] operating a motorized vehicle." R. 28. Likewise, Dr. Cremerius opined that, because of Plaintiff's mental disorders, he would limit Plaintiff to performing no fast-paced tasks; understanding and remembering only simple instructions; performing simple, routine activities; and having incidental contact with the public, occasional contact with co-workers, and unlimited contact with supervisors. R. 66. That opinion also corresponds to the ALJ's finding that Plaintiff has the RFC to perform work "except for . . . remembering other than simple instructions; carrying out other than simple, routine tasks; performing tasks requiring other than incidental public contact; performing tasks requiring other than occasional contact with coworkers; or performing fast paced tasks." R. 28. Considered together with the opinions of Drs. Bobholz and Soeldner, the opinions of Drs. Slodki and Cremerius provided additional, precise bases for assessing limitations on Plaintiff's ability to work.

Additionally, Plaintiff argues that the Commissioner's decision must be reversed because the ALJ failed to mention the opinions of three medical providers—Dr. J.W. Britton, Dr. Glenn A. Smith, and Kristine Twomey, an Advanced Practice Nurse Practitioner (APNP)[1]—regarding the alleged disabling effects of his seizure disorder. In November 2013, Dr. Britton conducted a follow-up evaluation at the Mayo Clinic for Plaintiff's seizure disorder, opining that Plaintiff "is disabled due to his seizures at the present time due to their lack of control (can't drive, can't operate machinery,

---

[1] Although the ALJ's opinion and Dr. Smith's treatment notes refer to "Dr. Twomey," the record documents identifying Twomey as their creator describe her as an "APNP." R. 16, 582. Accordingly, I will not refer to her as a doctor, consistent with her own apparent treatment records.

they are occurring approximately 1–2 per month and couldn't reassure an employer that they would not happen at the work site)." R. 521.

Contrary to Plaintiff's argument, the ALJ expressly acknowledged Dr. Britton's opinion that seizures with a frequency of once or twice a month would be disabling. R. 23. But the ALJ then explained that he disregarded this opinion because it was based off of Plaintiff's self reports, it was inconsistent with Plaintiff's treatment records from that time period, it did not indicate that Plaintiff's condition had been disabling for twelve continuous months, and Dr. Britton recommended a change in medication, suggesting a further opinion "that there might well be control gained with *appropriate* treatment." R. 23–24. The record indicates that Plaintiff experienced seizures in January 2011, August 2012, January and February 2013 (when he experienced four over the course of several weeks), and June 2013. R. 356, 364, 367, 412, 419. Although these records certainly indicate that Plaintiff experienced seizures at a frequency of once or twice a month during January and February 2013, the fact that they did not continue with that frequency indicates that the ALJ had substantial evidence to conclude that Dr. Britton overestimated the regularity of the seizures based on Plaintiff's reports.

Plaintiff similarly ignores the ample consideration given to Dr. Smith's treatment records throughout the ALJ's opinion. R. 16, 18, 22–24, 26. The ALJ noted Dr. Smith's May 2014 progress notes recording Plaintiff's mother's opinion that Plaintiff may experience OCD and ADHD, as well as Dr. Smith's June 2014 evaluation form observing that medication seemed to keep Plaintiff's seizures under control and speculating that Plaintiff's inactive lifestyle may be a consequence of "brain damage" arising out of his history of seizures. R. 24 (citing R. 556–58, 581–82). The ALJ noted that, as Plaintiff's primary care physician, Dr. Smith likely felt a sense of

15

obligation to record on the June 2014 evaluation form subjective symptoms and alleged limitations reported by Plaintiff and his mother. R. 24. Although the ALJ did not use the term "weight" in discussing these opinions, the reference to Dr. Smith's conveyance of subjective claims by Plaintiff and his mother strongly implies that the ALJ assigned little "weight" to these opinions to the extent they were not otherwise consistent with the record evidence.

Finally, any error in the ALJ's failure to mention the opinion of APNP Twomey was harmless. At an October 2016 follow-up appointment regarding Plaintiff's seizures, APNP Twomey opined that she thought Plaintiff "might do better with management of his mood disorder." R. 658. Adding that she "support[ed] his disability application," APNP Twomey further explained that, "[i]n addition to his emotional issues, he does appear to have some underlying cognitive dysfunction that would make maintaining employment exceedingly difficult." *Id.* Under the regulations in force at the time Plaintiff filed his claim, however, nurse practitioners and APNPs were not "acceptable medical sources" capable of establishing the existence of a claimant's impairments. 20 C.F.R. § 416.913(a). Consequently, the ALJ's failure to mention APNP Twomey's opinion does not mandate reversal because her opinion could not, standing alone, establish any impairment. Moreover, her opinion that Plaintiff experiences cognitive difficulties that affect his ability to maintain employment is cumulative of the various other opinions from acceptable medical sources contained in the record.

## B. Findings to Support the RFC Determination

Further contending that there is not substantial evidence to support the ALJ's RFC determination, Plaintiff argues that the ALJ erred by not making a finding as to the precise frequency of his seizures. The RFC represents "the maximum a person can do—despite his limitations—on a

16

'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96–8p). The ALJ alone is responsible for creating the RFC. 20 C.F.R. §§ 404.1545(a); 404.1527(d)(2). In formulating the RFC, an ALJ must review all of the relevant evidence in the record, including any information about the claimant's symptoms and any opinions from medical sources about what he can still do despite his impairments. SSR 96–8p, 1996 WL 374184, at *2.

Plaintiff argues that the Seventh Circuit's decision in *Boiles v. Barnhart* mandates that the ALJ make a finding as to the frequency of a claimant's seizures any time the ALJ finds that a seizure disorder constitutes a severe impairment. 395 F.3d 421, 427 (7th Cir. 2005). But the relevant discussion in *Boiles* is distinguishable because it involved an instruction on remand. The claimant in *Boiles* urged the Seventh Circuit to reverse the ALJ's opinion and award benefits without remanding the case, but the court explained that remand was necessary because "the record [did] not yet support a finding that Boiles's condition [was] 'at least equal in severity and duration' to epilepsy as described in Listing 11.02. In particular, the ALJ made no finding about the frequency of Boiles's seizures." *Id.* Thus, the need for the precise finding in that case arose out of the Seventh Circuit's instruction to consider the listing on remand, rather than the RFC determination, which is the portion of the analysis at issue in this case.

With that distinction clear, Plaintiff has not shown that the ALJ's RFC formulation lacks support from substantial evidence in the record. Plaintiff points to Dr. Smith's September 2015 observation that Plaintiff "does get occasional absence seizures but not tonic clonic type." R. 583. Whereas tonic clonic seizures involve collapse, loss of consciousness, and shaking, a person experiencing an absence seizure will stare into space for several seconds without losing motor

control and have no memory of doing so afterwards. Due to the memory loss associated with absence seizures, Plaintiff's mother has indicated that they are not sure how frequently Plaintiff experiences them. R. 73, 353. But as the ALJ noted, medical records did not document any memory loss after even Plaintiff's convulsive seizures. R. 22–23. Plaintiff's mother also stated Plaintiff needed to sleep a full week after having a seizure. No medical evidence supports this allegation either, and even Plaintiff did not endorse it. In short, there is no evidence that Plaintiff continued to experience these seconds-long absence seizures, or if he did, that they resulted in any functional limitations.

Plaintiff also argues that there is not substantial evidence to support the ALJ's limitations for avoiding workplace hazards; understanding and remembering only simple instructions; carrying out only simple, routine tasks; performing tasks requiring no more than incidental public contact; performing tasks requiring no more than occasional contact with co-workers; and performing fast-paced tasks. He argues that the ALJ's limitation for avoiding workplace hazards is not supported by substantial evidence because the "ALJ did not explain how this limitation would accommodate [Plaintiff's] seizure disorder given that [Plaintiff] does not leave his home unattended, does not drive . . . , requires supervision and a helmet in the shower for fear he will have a seizure and fall, and is not permitted to use a stove." Pl.'s Br., ECF No. 14 at 17. It is clear from the ALJ's decision, however, that he found these "self-limiting behaviors are unassociated with either the precipitating or aggravating factors" of his seizures. R. 25. In other words, the ALJ found that the restrictions placed on Plaintiff were excessive given the fact that he had not had a convulsive seizure for more than two years by the time of the hearing. The ALJ found that the risk of an uncontrolled

seizure would be adequately addressed by a limitation excluding Plaintiff from working in a hazardous workplace.

## C. Plaintiff's Subjective Complaints of Impairments

As his final avenue for challenging the ALJ's opinion, Plaintiff argues that the ALJ erred by finding Plaintiff's subjective complaints of disabling symptoms not credible. The regulations set forth a two-step process for evaluating a claimant's statements about his symptoms. *See* 20 C.F.R. § 416.929. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 416.929(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity for work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.*

Until recently, the evaluation of the intensity, persistence, and limiting effects of the claimant's symptoms was viewed by the SSA as a credibility determination. *See* SSR 96-7p, rescinded and superceded by SSR 16-3p (effective March 27, 2016, and republished October 25, 2017). In adopting SSR 16-3p, the SSA eliminated the use of the term "credibility" from its sub-regulatory policy in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2017 WL 5180304, at *2 (Oct. 25, 2017). Under SSR 16-3p, the question the SSA asks is whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record." *Id.* at *2. Since SSR 16-3p was in effect at the time the ALJ

issued his decision in this case, it is that ruling that governs my review here. *Id.* at *1. Accordingly, statements by the claimant concerning the intensity, persistence, and limiting effects of his impairments that are inconsistent with the medical and other evidence in the record need not be accepted by the ALJ in reaching a decision. *Id.* at *8.

A court's review of a consistency determination, like credibility, must be "extremely deferential" if judicial review is not to become de novo review. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted).

Here, Plaintiff contends that the ALJ erred in two ways when conducting what Plaintiff still calls the "credibility" determination. First, Plaintiff argues that the ALJ's decision includes the ALJ's impermissible lay assessment of his psychological condition. *See Myles*, 582 F.3d at 677 ("Common sense can mislead; lay intuitions about medical phenomena are often wrong." (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990))). Second, Plaintiff argues that the ALJ improperly rejected his complaints of side effects from his medication. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("[W]e are skeptical that a claimant's failure to identify side effects undermines her credibility . . . .").

With regard to the first alleged error, Plaintiff objects to the ALJ's observation that Plaintiff "exhibited no obvious emotional or cognitive deficits at the hearing." R. 20. However, in describing the manner in which the SSA evaluates information from non-medical sources, SSR 16-3p notes that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." 2017 WL 5180304, at *7. The ALJ's observation here introduced a larger discussion in which he explained that "the medical evidence is not consistent with [the] extreme limitations" Plaintiff reported in his testimony at the hearing. R. 20. Specifically, the ALJ evaluated Plaintiff's demeanor at the hearing and his testimony about his extremely limited daily activities, on the one hand, and the "relative infrequency" of his dangerous seizures as documented in the medical evidence, on the other. *Id.* Thus, the ALJ's comment regarding Plaintiff's appearance at the hearing reflected not an impermissible lay medical opinion but a single component of the ALJ's detailed evaluation of Plaintiff's subjective statements for consistency with the objective medical evidence.

The ALJ began his analysis of Plaintiff's alleged symptoms by noting that "it is difficult to separate out the claimant's perceptions from those of his mother who, understandably, given the history she provided (e.g., Exhibit 2E, p. 10/cf. Exhibit 21F, p. 2) has been protective of his well-being." R. 19. In any event, the ALJ noted that the limitations they both described "are consistent with the need for placement in a skilled nursing home." R. 20. In contrast, the ALJ pointed to activities that Plaintiff admitted he performed that suggested he was not as limited as his daily routine indicated. He could feed and water his dog and had no problems sitting, feeding himself, or toileting. He was able to keep his room somewhat clean and cleaned a couple of hours weekly, though he later reported that "his mother feels it is safer if she does the household chores." *Id.*

Plaintiff argues that the ALJ's reference to his daily activities draws a false equivalence between the ability to maintain full time employment and the ability to engage in minor daily activities like feeding a dog. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer."). Again, however, Plaintiff fails to recognize that the ALJ provided precisely the explanation that he contends is missing from the ALJ's analysis. The ALJ introduced this observation regarding Plaintiff's daily activities by noting that it was "inconsistent" with Plaintiff's other reports regarding the severity of his limitations, including reports that he "need[s] to rely upon his mother to help him with most things" and that he is "unable to shower without the use of a protective helmet, and having someone nearby to monitor him." R. 19–20. The ALJ's consideration of Plaintiff's activities reflects not an unreasonable finding of false equivalence between daily activities and work activities, but a reasonable assessment by the ALJ regarding the internal consistency of Plaintiff's self-reported limitations. *See Pepper*, 712 F.3d at 369 (noting that daily activities, even if not indicative of ability to work full-time, can undermine plaintiff's alleged disability).

More importantly, the ALJ found "the medical evidence is not consistent with such extreme limitations." *Id.* Except for his first adult seizure in early 2011, the one or two in August of 2012, and those reported in February and June of 2013, the ALJ noted that Plaintiff had been seizure free, at least as far as the hospital and treatment records showed. R. 25. The ALJ further noted that, contrary to Plaintiff's mother's report, the "relative infrequency of his seizures has not been documented in the medical evidence as resulting in either cognitive deficits or restrictions of daily

living." R. 20. And in response to questioning at the hearing as to whether his seizures were well-controlled, Plaintiff testified that "so far it's been pretty good," although the ALJ also acknowledged that he said he continued to feel dizzy and tired. R. 24. In view of this history, the ALJ found that Plaintiff's self-limiting behaviors are "unassociated with either precipitating or aggravating factors." R. 25.

Plaintiff also argues that the ALJ improperly rejected his reports of side effects—particularly fatigue and drowsiness—from the medications used to control his seizures. In March and October 2015, Plaintiff reported that he has been taking 1000 mg of Levetiracetam twice daily since November 2013 and 400 mg of Lamotrigine twice daily since December 2010. R. 333, 340. In his testimony and his functional reports submitted in support of his application for SSI, Plaintiff alleged that his medications make him feel tired and cause dizziness and memory loss. R. 68–70, 269, 275, 292. His mother also reported Plaintiff's frequent dizziness and fatigue. R. 77, 353. The ALJ acknowledged these reports by Plaintiff and his mother but also explained that "such reports of adverse effects of medication are not included in [Plaintiff's] treatment records." R. 25.

Plaintiff counters that, "while not numerous, there are treatment notes reflecting complaints of fatigue and recognizing that Mr. Rockwell's medications often do cause exactly the side effects he reported and testified to." Pl.'s Br., ECF No. 14 at 19 (citing R. 521, 583–84). But the two documents Plaintiff cites do not even demonstrate that he reported dizziness and fatigue associated with medication to his medical providers. First, he cites Dr. Britton's November 2013 Mayo Clinic report, which merely notes that the doctor advised Plaintiff about the possibility that his medication could cause side effects. R. 521. Second, Dr. Smith's September 2015 treatment notes state in two places that Plaintiff "[d]oes complain of chronic fatigue issues" and contain an additional note that

23

his neurologic system is affected by "[s]eizure disorder and fatigue." R. 583–84. Even these forthright acknowledgments of Plaintiff's reports of fatigue in Dr. Smith's treatment notes, however, do not establish objective medical evidence of a connection between his medications and the fatigue and dizziness that he reports. Rather, they demonstrate that Plaintiff reported fatigue to Dr. Smith, but they make no connection between the reports of fatigue and his medication. Nor are the reported side-effects so severe as to preclude all work. Where, as here, an ALJ identifies a significant inconsistency between objective medical records and a claimant's allegations of severely disabling limitations, the ALJ does not err in adopting an RFC formulation that hews more closely to the medical evidence than to the claimant's allegations.

Finally, the ALJ also thought it significant that other than medication, no other treatment was documented. The treatment records did not show significant problems with mood or mental functioning. Plaintiff's primary care physician had noted mild depression that did not require treatment, and Plaintiff himself either denied, or had not exhibited signs of, depression or anxiety. The ALJ noted Plaintiff "has exhibited a remarkably normal mental status despite his chronic illness." R. 26. Surprisingly, considering his otherwise apparent good health, there was no indication Plaintiff had ever sought evaluation or assistance from the Wisconsin Division of Rehabilitation Services (DVR), even though Dr. Bobholz thought he might benefit from DVR assistance. Given the limited medical evidence of significant limitations, and in the absence of any attempt to take advantage of such services, it was difficult to say that Plaintiff was not capable of far more than his daily routine required. Thus, in rejecting the suggestion that Plaintiff would be "off-task too frequently to perform work independently, e.g., without a job coach," the ALJ noted he found such a limitation not established because "due to documented psychosocial factors, the demands that have been placed

upon the claimant during his life have been minimal." R. 26. In other words, absent some evidence that Plaintiff has ever been placed in a position to perform such tasks on his own, the ALJ found it impossible to say on the record before him that Plaintiff could not perform even the simple, routine tasks called for by the RFC he formulated.

## CONCLUSION

Plaintiff may be as limited as his daily routine suggests. But the ALJ's conclusion that the evidence of record fails to establish the severe limitations claimed is not unreasonable. The ALJ complied with the SSA's rules and regulations in assessing the record, and substantial evidence supports his conclusion. The decision of the Commissioner is therefore **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** this 29th day of March, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court